# In the United States Court of Federal Claims

CHARLES TODD SULLIVAN,

*Plaintiff,*

v.

UNITED STATES,

*Defendant.*

No. 18-1862C
(Filed: April 21, 2022)

*Charles Todd Sullivan*, *pro se*, Gainesville, FL.

*Joshua A. Mandlebaum*, Civil Division, United States Department of Justice, Washington, DC, for Defendant.

## OPINION AND ORDER

**LERNER,** *Judge.*

      Charles Todd Sullivan filed a claim for lost military pay resulting from his discharge from the United States Army.  The Government moved to dismiss under Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC) and alternatively moved for judgment on the administrative record.  *See* Def.'s Mot. to Dismiss and Mot. for J. on the Admin. R., ECF No. 17 ("Def.'s Mots.").  Mr. Sullivan opposed both motions, submitted a cross-motion for judgment on the administrative record, and moved to supplement the administrative record.  *See* Pl.'s Resp., Cross-Mot. for J. on the Admin. R., and Mot. to Suppl. on the Admin. R., ECF No. 22 ("Pl.'s Resp. and Mots.").  Oral argument on the motion was held on November 10, 2020, before Judge Victor J. Wolski.  *See* Hr'g Tr., ECF No. 36.  The case was transferred to the undersigned on February 28, 2022.  *See* Order, ECF No. 38.

      After a thorough review of both the pleadings and the oral argument transcript, for the following reasons the Court **GRANTS-IN-PART** the Government's Motion to Dismiss and **GRANTS** the Government's Motion for Judgment on the Administrative Record.  The Court **DENIES** Plaintiff's Cross-Motion and Motion to Supplement the Administrative Record.

## I.      Background

### A.      Factual History

This case involves Plaintiff Charles Todd Sullivan's general (under honorable conditions) discharge from the United States Army ("Army") following an Army Board of Inquiry ("BOI" or "Board") finding that Mr. Sullivan made false statements and submitted a false police report regarding an alleged attack.  Administrative Record ("AR") 27, 30–56.

Mr. Sullivan was a Captain in the Army stationed as an instructor at Fort Huachuca in Arizona.  *See* AR 838–39.  He was scheduled to change duty stations and prepared to move to Fort Benning, Georgia, in October 2011.  AR 836.  Mr. Sullivan's permanent change-of-station orders required him to report in "satisfactory physical condition" and "meet weight standards." *Id.*  The Army's Weight Control Program ("AWCP") requires that servicemembers maintain allowable body fat percentages that are dictated by age, sex, height, weight, and body measurements.  *See* Army Reg. 600-9; AR 215–16.  Personnel "who are overweight . . . [a]re nonpromotable . . . [w]ill not be assigned to command . . . [a]re not authorized to attend professional military schools," and may face additional consequences.  AR 217.

 In July 2011, Mr. Sullivan's Company Commander and Company First Sergeant discovered an issue with a "flag" on his personnel record.  AR 167–69.  A "flag" is a notation on the personnel record related to an unsatisfactory condition—such as being in violation of the AWCP—that prevents advancement and results in a "suspension of favorable personnel actions." *See Hale v. United States*, 107 Fed. Cl. 339, 341 n.2 (2012); Army Reg. 600-8-2 ¶ 1–10(a).  Mr. Sullivan's Company Commander and Company First Sergeant reviewed his medical documentation and "discovered that CPT [Captain] Sullivan had signed his own flag removal paperwork[,] which is not authorized."  AR 167.  Additionally, they examined Mr. Sullivan's Army Physical Fitness Test scorecards from March and July 2011 and noticed "significant differences" in his past height measurements.  *Id.*

The First Sergeant next spoke with the examiner for Mr. Sullivan's latest medical test and discovered that Mr. Sullivan had already pre-filled the height and weight components of his scorecard before giving it to the examiner for the test.  *Id.*  Because significant changes in height impact the allowable body fat percentage a servicemember is permitted, Mr. Sullivan's supervisor became suspicious and ordered that Mr. Sullivan complete an additional height and weight examination on July 25, 2011.  AR 172; Compl. ¶ 15, ECF No. 1.  Mr. Sullivan did not dispute that his height was different on past tests but claimed that the discrepancies in height related to a documented spinal condition for which he had medical paperwork.  AR 172; Compl. ¶ 15.

**Hiking Incident.**  On July 24, 2011—the day prior to the scheduled height and weight test—Mr. Sullivan went hiking with his stepson in the nearby Huachuca Canyon.  Compl. ¶ 18. According to the Complaint, as the pair approached their car at the end of the hike, Mr. Sullivan told his stepson he was going to walk a short distance down a trail to scope out a spot for a future outing.  Compl. ¶ 18; AR 47, 387–88.  After walking for a few minutes, he was allegedly attacked by a man with a box cutter that appeared to Mr. Sullivan to be a "drug mule" or

"undocumented immigrant." Compl. ¶ 18; AR 40, 387–90. A "brief scuffle" ensued, Mr. Sullivan kicked the assailant, and the assailant dropped the box cutter and ran away. Compl. ¶ 18.2; AR 389–90.

Mr. Sullivan reported the attack to the authorities and was transported to a civilian hospital for multiple lacerations to his torso, left arm, and neck, and a bruise to his hindquarters. *See* Compl. ¶ 18.3; AR 115, 150, 378–91, 489–98. He received 18 stiches to his stomach and arm, two Vicodin tablets for pain, and was released from the hospital that evening. Compl. ¶¶ 18.2–18.3; AR 403, 489, 494. Military police investigators collected the box cutter and Mr. Sullivan's torn shirts as evidence. AR 367–69.

**July 25 Test.** Mr. Sullivan reported for his height and weight test the following day. AR 403; Compl. ¶ 20.1. Examiners measured his height and weight but were unable to measure the circumference of his abdomen due to a large bandage covering his wounds. AR 403. Based on the height and weight recorded, Mr. Sullivan would have failed and been flagged as overweight. *Id.* [1]

**July 27 Test.** On July 27, 2011, Mr. Sullivan was summoned by military investigators to identify the crime scene for evidence. AR 201; Compl. ¶¶ 20.4, 34.8. This aggravated his wounds, so Mr. Sullivan took a prescribed Vicodin tablet. Compl. ¶ 20.4. He then reported to the rescheduled height and weight test. AR 174, 207. Mr. Sullivan did not have his military identification card with him and, therefore, had to provide the examiner his administrative information for his scorecard orally. AR 174. Plaintiff—who was 39 at the time and turning 40 three days later—reported to the examiner that he was 40 years old. *Id.* The examiner took Mr. Sullivan's measurements and reported that he passed with a 26 percent body fat allowance, which is the threshold for servicemembers that are 40 or older. AR 174, 216.

After the exam, the Company First Sergeant alerted the examiner that Mr. Sullivan was in fact 39 years old—not 40 years old as he told the examiner. AR 174, 404. Because soldiers in the 28–39 age group are only permitted a 24 percent body fat level, Mr. Sullivan did not meet the allowable body fat standard and failed the test. *See* AR 174, 216, 368. Mr. Sullivan claims he was under the influence of Vicodin at the time, that the examiner misunderstood him, and that he "can't remember exactly what transpired" during the test but did not lie about his age. Compl. ¶ 34.11.

On July 28, Mr. Sullivan's company commander reported to the military investigators examining the hiking incident that Mr. Sullivan had lied during the July 27 body fat test. AR 207. Other discrepancies in Mr. Sullivan's July 27 test, as well as prior medical tests that were held earlier in July and March, emerged during the subsequent investigation. For example, the examiner for the July 27 test reported that she had to tell Mr. Sullivan "at least three times to stop raising his heels off the ground and place his feet flat on the floor" and to stop flexing his

---

[1] The grader records the servicemember's height and weight. If the servicemember exceeds the permissible weight based on their height, the grader takes measurements of the neck and abdomen, to use "the height, weight and age to determine the measured body fat." *See* Compl. ¶ 20.1; Army Reg. 600-9, The Army Weight Control Program ¶ 3–2, App. B (2006).

neck muscles to attempt to make his neck circumference larger. AR 174. Examiners also noted that Mr. Sullivan "turtle[d]" his neck during the exam, which is a technique used by servicemembers to increase the circumference of the neck and make it easier to pass the exam. AR 37–39.

In addition, an examiner for a medical test held earlier in July 2011 reported that Mr. Sullivan had appeared for his physical and emailed the examiner his scorecard with the height and weight already filled in. AR 39. This examiner also reported that Mr. Sullivan identified himself as 40 years old. *Id.* The scorecard from the resulting test lists Mr. Sullivan as 40 years old, 71 inches tall, and 193 pounds—which are measurements that pass the AWCP requirements. AR 143, 216. Finally, investigators discovered a scorecard from a March 2011 test that identifies Mr. Sullivan as 39 years old, 71 inches tall, and 194 pounds, which are also passing measurements. AR 144, 216; *see* AR 169.[2]

Military police investigators raised doubts about the claimed July 24 hiking attack. Investigators had difficulty identifying the crime scene due to Mr. Sullivan's broad description and hypothesized that the box cutter's safety blade should have broken under the excessive force used to cut through multiple items of clothing. *See* AR 149, 203–08. They also noted that Mr. Sullivan lacked defensive wounds and would have been a difficult opponent given his size. AR 149–50. Sensors and border cameras did not show either anyone matching the alleged assailant's description or Mr. Sullivan in the area. AR 149. Ultimately, investigators concluded that the wounds could have been self-inflicted given their "depth, direction and location." AR 149–50. This was reiterated by Mr. Sullivan's Company First Sergeant, who speculated that Mr. Sullivan injured himself to avoid the test and reportedly asked, "[w]hy do you think he cut himself?" when contacting military police following the incident. AR 205; Compl. ¶ 19.

**Army Investigation and Discipline.** On July 28, 2011, the Company Commander informed Donald Forbis, a military police investigator overseeing the Huachuca Canyon incident, about Mr. Sullivan's allegedly false statements about his age. AR 207. Mr. Forbis summoned Mr. Sullivan to the military police station to provide additional information, where Plaintiff alleges (and the Government denies) that military police violated 10 U.S.C. § 831 by giving him a military rights warning that failed to address the acts he was suspected of committing. Compl. ¶ 20.5; AR 369. Mr. Sullivan invoked his right to speak to a lawyer and ended the meeting. AR 207; Compl. ¶ 20.5.

That same day, Mr. Forbis contacted Fort Huachuca's Staff Judge Advocate's Office, which determined probable cause existed to believe that Mr. Sullivan violated the Uniform Code of Military Justice (UCMJ) by making false statements about his age. AR 115, 201. Military police and the United States Army Criminal Investigation Laboratory ("USACIL") initiated a simultaneous investigation into the Huachuca Canyon assault. The investigation could not find fingerprints on the box cutter but did find hairs on Mr. Sullivan's shirts from the day of the

---

[2] Overall, additional height, a thicker neck, or older age increases the amount of body fat a servicemember is permitted. AWCP guidance lists the permitted maximum weight for a 71" tall male as 194 pounds for ages 28–39 and 197 pounds for ages 40 and older. AR 216. For a 70" tall male, these amounts are 189 and 192; for a 69" tall male these amounts are 184 and 186. *Id.*

attack, which the investigators declined to test.  AR 362–63.  Mr. Sullivan is bald or short-haired.  AR 20, 226.  Military police concluded that Mr. Sullivan falsely reported the July 24, 2011 attack.  AR 116, 370.  The final report stated that Mr. Sullivan may have injured himself to avoid participating in the height and weight test and speculated that he may have been "enormously stressed" about his permanent change-of-station to Fort Benning.  AR 115, 212, 370.

On October 28, 2011, Brigadier General Gregg Potter, the commander of the Army Intelligence Center of Excellence and Fort Huachuca, issued Mr. Sullivan a general officer memorandum of reprimand ("GOMOR") for (1) injuring himself to avoid the body fat test; (2) making a false report to military police about the Huachuca Canyon incident; and (3) making false statements about his age.[3]  AR 770.  Mr. Sullivan submitted a statement and documents to rebut the GOMOR, AR 759–69, but Mr. Sullivan's company, battalion, and brigade commanders nevertheless recommended that Brigadier General Potter file the GOMOR in Mr. Sullivan's personnel file, which he did on December 5, 2011.  AR 754–55.  Brigadier General Potter also served as the general officer show cause authority ("GOSCA")—a commanding officer for separation proceedings—and that same day he informed Mr. Sullivan of proceedings to effectuate his discharge.  AR 756–58.  Mr. Sullivan elected to proceed via a BOI.[4]  AR 753.

**BOI Proceedings**.  An Army-provided judge advocate represented Mr. Sullivan during BOI proceedings.  AR 30.  The BOI received evidence from Mr. Sullivan and the Army, including testimony from Mr. Sullivan's test examiners, his performance test scorecards, and testimony from military investigator Forbis.  *See* AR 20–56.  The BOI heard evidence from Mr. Sullivan's former battalion commander that Mr. Sullivan was previously flagged as overweight and passed the height and weight exam "by the bare minimum" before being deployed to Iraq in 2009.  AR 51.  Lastly, the former battalion commander suggested, though without offering evidence, that Mr. Sullivan pilfered money from a battalion fund.  *Id.*  Mr. Sullivan contests these allegations as false.  Compl. ¶¶ 34.5–34.7; Pl.'s Resp. and Mots. at 85–86.

On March 5, 2012, the BOI found by a preponderance of the evidence that Mr. Sullivan had: (1) unlawfully cut himself; (2) falsely reported police that he was attacked; (3) knowingly made a false statement to First Sergeant Garcia about his age; and (4) conducted himself in a manner unbecoming an officer and which constituted misconduct, or moral or professional dereliction.  AR 27, 54.  The Board elaborated that the original investigation into his attack "lacked significant substantiating evidence" and the Board could not "confirm or deny the attack."  AR 55.  It nevertheless concluded that:

> CPT Sullivan's statements and actions leading up to the 24 July 2011 event call into question his integrity and motives.  Lacking convincing evidence to confirm or deny the attack and significant shortfalls in the [military police] investigation,

---

[3]  A GOMOR is a reprimand letter for alleged misconduct that may serve as the basis for adverse personnel actions including separation from the Army.  *See* Army Reg. 600-37 ¶ 5-2(b).

[4]  A BOI is an adversarial administrative separation board for a military officer that considers whether an officer should be separated for cause and, if so, what the appropriate characterization of service should be.  *See generally* Army Reg. 600-8-24 ¶ 4-6.

the Board made a determination based on an assessment of CPT Sullivan's motives and documented integrity issues.  Based on this the Board also found that CPT Sullivan did falsify an official report.

Concerning the events of 28 July 2011, the Board overwhelmingly believes that CPT Sullivan did intend to deceive 1SG Garcia by stating "he was 40 years old." The deception was likely driven by his desire to meet the Army Weight Control Standards.
Based principally on the judgment that CPT Sullivan attempted to deceive 1SG Garcia on or about 28 July 2011 and likely injured himself on 24 July 2011, the Board strongly believes CPT Sullivan conducted himself in a manner unbecoming an officer and which constituted misconduct or moral and professional dereliction because of his actions with and toward the U.S. Army.

AR 55.  Based on these findings, the BOI recommended that Mr. Sullivan be separated from the Army with a general (under honorable conditions) characterization of service.  AR 55–56.

Mr. Sullivan opted to appeal the BOI decision through the GOSCA, Brigadier General Potter, which was denied.  AR 702–49.  This appeal was also denied, and the BOI proceedings were forwarded to U.S. Army Human Resources Command for review by the Army Board for Review of Eliminations ("ABRE").  AR 702.  Mr. Sullivan submitted a congressional inquiry through the office of then-Representative Cliff Stearns for additional information to supplement his appeal papers, which the Army received and incorporated into his appeal.  AR 7–14.  The ABRE convened in November 2012 and recommended Mr. Sullivan for elimination after reviewing "the records of [the] case" and reaching the same conclusion as the BOI.  AR 2–6. Based on the BOI and ABRE recommendations, the Deputy Assistant Secretary of the Army for Review Boards ("DASA-RB") separated Mr. Sullivan with a general (under honorable conditions) characterization of service in December 2012.  AR 800.

## B.    Procedural History

Mr. Sullivan, proceeding *pro se*, filed a complaint with this Court in November 2018. The Complaint alleges that the ABRE elimination determination ("separation determination" or "discharge") failed to comply with "regulations, statutes, or the Constitution," including the "Military Pay Act."  Compl. ¶ 1.  The gravamen of the Complaint includes Mr. Sullivan's allegations of impropriety surrounding the military police investigation into the Huachuca Canyon incident and misconduct by the Army during administrative separation proceedings.  *See* Compl. ¶¶ 12, 16, 20.3–20.5, 21.6–21.7, 25, 29, 30.1, 30.5, 30.7, 30.12–30.13, 31, 32–35.16, 42. Overall, Plaintiff requests relief in the form of back pay, restoration to active duty at the rank of Captain, and restoration of his pay, leave credit, and records in the Army.  *See* Compl. ¶ 55.

The Government filed a motion to dismiss under RCFC 12(b)(1) and 12(b)(6) and an alternative motion for judgment on the administrative record.  *See generally* Def.'s Mots. Plaintiff filed a cross-motion for judgment on the administrative record and a motion to supplement the administrative record.  *See* Pl.'s Resp. and Mots.

## II.     DISCUSSION

### A.     Motion to Dismiss

#### 1.     Standards of Review

Plaintiff must establish the Court's subject matter jurisdiction over the claim before proceeding on the merits. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998). The Tucker Act confers upon the Court of Federal Claims jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). Because the Tucker Act only waives sovereign immunity and does not itself create substantive rights, a plaintiff must identify a separate source of law that can be fairly interpreted as creating a right to money damages. *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005); *see also United States v. Navajo Nation*, 556 U.S. 287, 289–90 (2009).

When considering a motion to dismiss for lack of subject matter jurisdiction, all factual allegations in the complaint are treated as true and construed in a light most favorable to the non-moving party. *Estes Express Lines v. United States*, 739 F.3d 689, 692 (Fed. Cir. 2014) (citing *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583–84 (Fed. Cir. 1993)). The non-movant bears the burden to prove by a preponderance of the evidence that the Court has jurisdiction over his claims. *Id.* (citing *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988)).

The Court also "must assume that all undisputed facts alleged in the complaint are true and draw all reasonable inferences in the non-movant's favor" when deciding on a motion to dismiss for failure to state a claim. *Lippman v. United States*, 127 Fed. Cl. 238, 243 (2016) (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)). However, the complaint must also "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Harris v. United States*, 868 F.3d 1376, 1379 (Fed. Cir. 2017). When the complaint fails to "state a claim to relief that is plausible on its face," this Court must dismiss it. *Iqbal*, 556 U.S. at 678 (quotation marks and citation omitted).

Claims before this Court must also be justiciable. *Murphy v. United States*, 993 F.2d 871, 872 (Fed. Cir. 1993); *see, e.g.*, *Lippmann*, 127 Fed. Cl. at 243. This Court and other federal courts have long abstained from reviewing the substance of decisions committed wholly to the discretion of the military on prudential grounds. *See Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002). "Because 'decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments,' . . . the substance of such decisions, like many other judgments committed to the discretion of government officials, is frequently beyond the institutional competence of courts to review." *Id.* (quoting *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973)) (citation omitted). Instead, "military decisions are justiciable only to the extent that the military's discretion is limited and Congress has provided 'tests and

standards' for the Court to apply." *Lippman*, 127 Fed. Cl. at 244 (citing *Murphy v. United States*, 993 F.2d 871, 873 (Fed. Cir. 1993)).

But while the "*merits* of a decision committed wholly to the discretion of the military are not subject to judicial review, a challenge to the particular *procedure* followed in rendering a military decision may present a justiciable controversy." *Adkins v. United States*, 68 F.3d 1317, 1323 (Fed. Cir. 1995) (emphasis in original).  Where a plaintiff alleges that procedural violations occurred as opposed to substantive determinations, as happened here, "the test or standards against which this Court measures the military's conduct are inherent: they are the applicable statutes and regulations."  *Id.* (citing *Murphy*, 993 F.2d at 873).

### 2.    Subject Matter Jurisdiction Analysis

The Government first moves to dismiss under RCFC 12(b)(1) for lack of subject matter jurisdiction, namely Plaintiff's failure to ground his Complaint in a money-mandating statute. *See* Def.'s Mots. at 12–14.

The Complaint asserts multiple bases for the Court's subject matter jurisdiction.  Among others, it lists the Military Pay Act, Tucker Act, Administrative Procedure Act, 28 U.S.C. § 1331, and "regulations, statutes, or the Constitution."  Compl. ¶¶ 0–1.  It further details a litany of other allegations describing suspected misconduct during the military police investigation and administrative proceedings.  The Government characterizes these allegations as "claims that sound in tort or even criminal conduct."  Def.'s Mots. at 14.  However, Plaintiff's Complaint does invoke a money-mandating provision that establishes subject matter jurisdiction—the "Military Pay Act."  Compl. ¶ 1.

Generally, although "pro se plaintiffs are held to a lower standard of pleading than those represented by counsel, all those seeking to invoke the court's subject matter jurisdiction ultimately retain the burden of establishing that the jurisdictional requirements are met."  *Searles v. United States*, 88 Fed. Cl. 801, 803 (2009) (citing *Keener v. United States*, 551 F.3d 1358, 1361 (Fed. Cir. 2009)).  Some leniency is "afforded to a *pro se* litigant with respect to mere formalities [but this] does not relieve the burden to meet jurisdictional requirements."  *Minehan v. United States*, 75 Fed. Cl. 249, 253 (Fed. Cl. 2007) (citing *Kelley v. Sec'y, United States Dep't of Labor*, 812 F.2d 1378, 1380 (Fed. Cir. 1987)).

Here, Plaintiff's Complaint meets the jurisdictional requirements.  While Mr. Sullivan does not specifically cite the Military Pay Act in the Public Laws of the United States or the United States Code, his Response clarifies that the Complaint contemplates the Tucker Act's requirement for a money-mandating provision and that "[h]e makes one claim: 'The Government illegally discharged Mr. Sullivan from the U.S. Army by violating regulations, statutes, and Constitutional requirements.'"  Pl.'s Resp. and Mots. at 61–62 (quoting Compl. ¶ 2).  Moreover, Plaintiff asserts that the allegations that the Government characterized as "sounding in tort" are simply "factual matter [sic] that demonstrate procedural defects."  *Id.* at 64.  Overall, the Military Pay Act is sufficiently invoked and, as a money-mandating statute, it provides a basis for subject matter jurisdiction.  *See Holley v. United States*, 124 F.3d 1462, 1465 (Fed. Cir. 1997) ("It is well

established that 37 U.S.C. § 204 . . . serves as the money-mandating statute applicable to military personnel claiming damages and ancillary relief for wrongful discharge.").

The Complaint also provides a general citation to the Constitution and references a right "to a fair and impartial hearing" that appears to invoke the Fifth Amendment's Due Process Clause.[5]  Compl. ¶¶ 45–51.  The Due Process Clause is not a money-mandating provision in this context.  *See Smith v. United States*, 709 F.3d 1114, 1116 (Fed. Cir. 2013) ("The law is well settled that the Due Process clauses of both the Fifth and Fourteenth Amendments do not mandate the payment of money and thus do not provide a cause of action under the Tucker Act.").  Nevertheless, this Court is entitled to consider due process violations implicating procedural deficiencies in military separation administrative procedures asserted under the Military Pay Act.  *See Holley*, 124 F.3d at 1466 ("The determination of [Plaintiff's] entitlement to remedy under 37 U.S.C. § 204 may include consideration of whether his removal violated constitutional rights.").  Therefore, this Court has jurisdiction over procedural violations alleged in the separation proceedings under the Military Pay Act claim.

The Complaint's other alleged grounds for jurisdiction are insufficient for subject matter jurisdiction.  The Tucker Act does not, on its own, confer a grant of jurisdiction.  *See N.Y. & Presbyterian Hosp. v. United States*, 881 F.3d 877, 881 (Fed. Cir. 2018).  Nor does the Administrative Procedure Act.  *See Wopsock v. Natchees*, 454 F.3d 1327, 1333 (Fed. Cir. 2006) (quoting 5 U.S.C. § 702(a)) ("[T]he APA does not authorize an award of money damages at all; to the contrary, . . . the APA . . . specifically limits the Act to actions 'seeking relief other than money damages.'").  The federal question jurisdiction statute, 28 U.S.C. § 1331, does not apply to the United States Court of Federal Claims.  *See Faulkner v. United States*, 43 Fed. Cl. 54, 55 (1999) (citing *Crocker v. United States*, 125 F.3d 1475, 1476 (Fed. Cir. 1997)).  And to the extent that the Complaint does assert claims arising out of tort or criminal conduct, those fail.  *See* 28 U.S.C. § 1491; *Brown v. United States*, 105 F.3d 621, 623 (Fed. Cir. 1997) (first citing 28 U.S.C. § 1491(a); then *Keene Corp. v. United States*, 508 U.S. 200, 214 (1993)) ("The Court of Federal Claims . . . lacks jurisdiction over tort actions against the United States."); *Joshua v. United States*, 17 F.3d 378, 379 (Fed. Cir. 1994) ("The court has no jurisdiction to adjudicate any claims whatsoever under the federal criminal code.").

---

[5]  Other than references to a right "to a fair and impartial hearing," Compl. ¶¶ 41–51, Plaintiff only provides general references to the Constitution.  Mr. Sullivan made similar allusions during oral argument.  *See* Hr'g Tr. at 91:21–92:8.  There is "no duty on the part of the trial court to create a claim which plaintiff has not spelled out in his or her pleadings." *El v. United States*, 144 Fed. Cl. 741, 748 (2019) (quotation marks omitted) (quoting *Lengen v. United States*, 100 Fed. Cl. 317, 328 (Fed. Cl. 2011)).  However, "[w]hen determining whether a complaint filed by a *pro se* plaintiff is sufficient to invoke review by a court, a pro se plaintiff is entitled to a more liberal construction of the *pro se* plaintiff's pleadings." *Id.*; *Castro v. United States*, 540 U.S. 375, 381 (2003) ("Federal courts sometimes will ignore the legal label that a *pro se* litigant attaches to a motion and recharacterize the motion in order to place it within a different legal category.").  Here, Plaintiff's Complaint appears to meet the jurisdictional requirements of clarifying his Military Pay Act claim and, "'however inartfully pleaded,' must be held to 'less stringent standards than formal pleadings drafted by lawyers.'"  *Harris v. United States*, 113 Fed. Cl. 290, 292 (2013) (citing *Hughes v. Rowe*, 449 U.S. 5, 10 n.7 (1980)).

### 3.       Failure to State a Justiciable Claim Analysis

Defendant next moves to dismiss under RCFC 12(b)(6) for Mr. Sullivan's failure to state a justiciable claim.  Def.'s Mots. at 15–16.  The Government's primary argument is that because Mr. Sullivan failed to "articulate any procedural defects or failure on the part of the Army to follow its own regulations in its elimination proceedings," Mr. Sullivan's Military Pay Act claim is a nonjusticiable controversy.  Def.'s Mots. at 15.  Rather, the Government characterizes Mr. Sullivan's claims as "really premised on the merits of the decision to separate him from the Army" and argues that "the crux of the complaint is directed at underlying evidence before the agency and claims of fraud and conspiracy.  *Id.* (citing Compl. ¶¶ 0, 52).  These numerous claims of fraud or governmental misconduct fail to "address the question [of] whether the BOI, the ABRE, or the Secretary properly followed their procedures."  *Id.* at 16.

A plaintiff in a military pay case must allege procedural defects to present a justiciable controversy.  *See Adkins*, 68 F.3d at 1323.  In this regard, the Government asserts that only procedural defects committed during military separation proceedings are justiciable and that "issues *outside* the discharge proceedings do not render [Mr. Sullivan's] elimination invalid."  Def.'s Reply at 4, ECF No. 25 (emphasis added); *see also* Def.'s Mots. at 15–16.  But little support exists for this proposition.[6]  "It is elementary that an agency must follow its own regulations, and that a discharge brought about in violation of those regulations is invalid and cannot stand."  *Cruz-Casado v. United States*, 553 F.2d 672, 675 (Ct. Cl. 1977) (first citing *Service v. Dulles*, then citing *Bray v. United States*, 515 F.2d 1383 (1975)).

Regardless of whether the procedure occurred before, during, or after the military's administrative separation proceedings, challenges to a particular procedure followed in rendering a military decision are justiciable.  *See Moehl v. United States*, 34 Fed. Cl. 682, 687 (1996) (citing *Adkins*, 68 F.3d at 1323) ("A military pay case is justiciable on the issue of compliance with applicable regulations. A challenge to the particular procedure followed in rendering a military decision may present a justiciable controversy."); *see, e.g.*, *Sobczak v. United States*, 93 Fed. Cl. 625, 632–34 (2010) (reviewing a plaintiff's allegations of the Marine Corps' failure to follow regulations during non-judicial punishment and BOI proceedings); *Cameron v. United States*, 106 Fed. Cl. 551, 560 (2012), *rev'd on other grounds*, 550 F. App'x 867 (Fed. Cir. 2013) (stating that the question of whether "the Army failed to follow its own directives and regulations by not bringing [a plaintiff's] record before a continuation board" is "within the scope of judicial competence.").

Turning to the specific alleged procedural violations at issue, Mr. Sullivan asserts a series of regulatory and statutory violations by Army officials.  The Complaint also goes further and provides a colorful backdrop of factual material that—though it lacks a reference to statutory or regulatory violations—purportedly adds support to Mr. Sullivan's claims.  His Response clarifies that "these items are factual matter [sic] that demonstrate procedural defects," but fails to clearly outline the exact procedural violations alleged in the Complaint.  Pl.'s Resp. and Mots. at 64.

---

[6]  The government appeared to concede this position at oral argument.  *See* Hr'g Tr. at 41:22–43:16.

While a *pro se* plaintiff's complaint is entitled to a liberal reading, there is "no duty on the part of the trial court to create a claim which plaintiff has not spelled out in his or her pleadings." *El*, 144 Fed. Cl. at 748 (citing *Lengen*, 100 Fed. Cl. at 328). Therefore, under such a reading of the Complaint, Mr. Sullivan spells out the following allegations:

**Claim 1.** Mr. Sullivan first alleges that military police violated 10 U.S.C. § 831 when, during questioning, they failed to notify him that he was suspected of violating the UCMJ. *See* Compl. ¶ 20.3. This allegation fails to state a claim for relief. Sections 831(b) and (d) only prohibit statements obtained without a rights advisement warning from being introduced into court-martial proceedings. *See* 10 U.S.C. § 831(d) ("No statement obtained from any person in violation of this article . . . may be received in evidence against him in a trial by court-martial."). But Mr. Sullivan was not the subject of a court martial—the BOI proceedings at issue were administrative proceedings. *See* Army Reg. 600-8-24 ¶ 4-6(a) (2010) ("Through a formal administrative investigation conducted under AR 15-6 and this regulation, the Board of Inquiry establishes and records the facts of the Respondent's alleged misconduct."); U.S. Dep't of Def., Instr. ("DoDI") 1332.30, Separation of Regular and Reserve Commissioned Officers, enclosure 3, ¶ 3(c) (Dec. 11, 2008) ("The Board of Inquiry is an administrative board that shall consider all relevant and material evidence about the case and shall function under rules and procedures established by the Secretary of the Military Department concerned."). Mr. Sullivan's other allegations of 10 U.S.C. § 831violations similarly fail to state a claim for relief. *See* Compl. ¶ 20.5 (alleging that "[Mr. Sullivan] was given a rights warning and advisement that did not address the acts he was suspected of, which was another violation of 10 USC 831" and that "LT Penland violated 10 USC 831 by not releasing Mr. Sullivan after he said he wanted to see an attorney").

**Claim 2.** Mr. Sullivan next alleges that military police violated Article 93 of the UCMJ— which forbids cruelty, maltreatment, or oppression toward those accused under the UCMJ, *see* 10 U.S.C. § 893—by aggravating his wounds when he was ordered out of his air-conditioned quarters to re-visit the Huachuca Canyon trail where he claimed his injuries occurred. *See* Compl. ¶¶ 20.2, 20.4. Even assuming the truth of this allegation, the Court of Federal Claims lacks jurisdiction over allegations of UCMJ violations unless the violations somehow corrupted the proceedings through which Plaintiff was separated—which Mr. Sullivan does not allege. *See* 10 U.S.C. § 893 ("Any person subject to this chapter who is guilty of cruelty toward . . . any person subject to his orders shall be punished as a court martial may direct.").

**Claim 3.** Administrative separation procedures began when Mr. Sullivan was issued a reprimand, or GOMOR, from his commanding general. AR 770. Mr. Sullivan alleges that he was not given a copy of the underlying materials of the reprimand when receiving the GOMOR, in violation of Army Regulation 600-37. *See* Compl. ¶ 21.2. This regulation, at paragraph 3-6, requires that "unfavorable information will be referred to the recipient for information and

acknowledgement of his or her rebuttal opportunity." [7]  Army Reg. 600-37 ¶ 3-6(a) (1986).  This is a procedural defect that states a valid claim.[8]

      **Claim 4.**  Mr. Sullivan alleges that Army military police violated Army Regulation 195-5 because evidence related to the incident in the Huachuca Canyon was not shipped to USACIL for at least fifteen days when the regulation states a requirement that it be shipped within five working days.  *See* Compl. ¶ 30.10, 30.11 (citing Army Reg. 195-5 ¶ 5-1(b) (2007)).  However, this regulation only requires that evidence needing examination be "expeditiously submitted . . . *normally* within five working days after being identified as requiring laboratory examination." Army Reg. 195-5 ¶ 5-1(b) (emphasis added).  "Normally" suggests discretion on the part of the laboratory.  The regulation further provides two generalized exceptions that are applicable here. First, "[e]vidence may only be held longer[] when the development of additional evidence is imminent or if the additional evidence is required to complete the requested examinations."  *Id.* Second, "[a]nother exception would be waiting for information to establish whether or not an actual crime has occurred."  *Id.*  Both exceptions may apply here, though neither is needed.  This allegation under Army Regulation 195-5 fails to state a claim.

      **Claim 5.**  Mr. Sullivan alleges two additional violations of Army Regulation 195-5.  *See* Compl. ¶¶ 30.12, 30.13.  First, Mr. Sullivan contends that evidence from his attack was not "protected, packed, and sealed," and that the notification of this improper packing was left out of the military police report despite USACIL's concerns.  Compl. ¶ 30.12 (citing Army Reg. 195-5 ¶ 5-1).  Mr. Sullivan further alleges that investigators failed to process evidence using "superglue fuming" prior to shipping it to the laboratory.  Compl. ¶ 30.13 (citing Army Reg. 195-5 ¶ 5-2). Unlike the requirement that evidence is "normally" shipped within five working days, these provisions of Army Regulation 195-5 lack a discretionary component.  Paragraph 5-1 states that "[e]vidence *will* be protected, packed, and sealed in accordance with this regulation," Army Reg. 195-5 ¶ 5–1(c) (2007) (emphasis added), and paragraph 5-2 states that "[a]ll nonporous items of evidence collected for possible latent print evidence *must* be processed using cyanoacrylate (superglue) fuming, prior to the items being sealed."  Army Reg. 195-5 ¶ 5–2(c) (2007) (emphasis added).  Because USACIL stated that proper handling did not occur and that the fuming process was not used on the box cutters for latent print evidence, Mr. Sullivan states a claim alleging a procedural violation regarding the handling of evidence.

---

[7]  Mr. Sullivan does not cite the corresponding paragraph but does cite to a general provision. *See supra* note 5.

[8]  Relatedly, Mr. Sullivan alleges in his Response—not his Complaint—that the GOMOR violated paragraph 1-1a(2) of the regulation for failing to include a second police report.  *See* Pl.'s Resp. and Mots. at 52 (citing Army Reg. 600-37 ¶ 1-1a(2)).  This regulation requires that "information that is . . . incomplete is not filed in individual official personnel files."  Army Reg. 600-37 ¶ 1-1a(2) (1986).  However, though Plaintiff alleges that the regulation was violated, he does not explain what constitutes a complete report—a term undefined in the cited regulation.  Paragraph 3-3(c) requires "[c]omplete investigative reports," noting that "[w]hen it is not practical to include the entire report (or an extract), the investigative report will be referenced."  Army Reg. 600-37 ¶ 3-3(c) (1986).  Mr. Sullivan has not alleged that a complete report was required and does not assert this regulatory violation in his Complaint.

**Claim 6.**  Mr. Sullivan alleges that the military police investigator charged with investigating his attack, Donald Forbis, lied under oath and made false statements during his testimony before the BOI.  Compl. ¶¶ 29–29.2.  For example, Mr. Forbis testified that he witnessed Mr. Sullivan through a two-way mirror during Mr. Sullivan's interview—a two-way mirror that Plaintiff contends does not exist.  *Id.*  But the Complaint does not cite any regulation or statute that this inconsistency in testimony and other alleged inconsistencies violate.  It only notes a general requirement for a fair and impartial hearing as set out in 10 U.S.C. § 1182(b), Army Regulation 600-8-24 ¶ 4-6(a), and DoDI 1332.30 ¶ 3(c).  *See* Compl. ¶ 45.

This claim is overall not a procedural violation alleging defects in the Army's determination process.  For one, while these comments feature prominently in Mr. Sullivan's briefs, *see, e.g.*, Pl.'s Reply at 17, ECF No. 30, the testimony in question was not so significant as to be recorded in the BOI transcript and Mr. Sullivan did not address it in his own rebuttal or testimony.  *See* Hr'g Tr. at 27:1–11; AR 52–53.  More importantly, the degree to which the Board weighed the integrity of Mr. Forbis's testimony is a substantive question that goes to the heart of re-weighing the merits of an administrative decision and one that this Court cannot address.  *See, e.g.*, *Taylor v. United States*, 199 Ct. Cl. 171, 174 (1972) ("This court will not reweigh the evidence presented at plaintiff's court-martial in order that it might substitute its judgment for that of the military trial court.").  Therefore, this allegation focusing on Mr. Forbis's testimony fails to state a justiciable claim.

**Claim 7.**  Mr. Sullivan alleges that military police investigators failed to follow Army Regulation 190-30 because the military police officers who investigated his case lacked the higher level of training and expertise needed to investigate serious offenses, or offenses defined as those with a maximum confinement of more than one year.  *See* Compl. ¶ 30.5 (citing Army Reg. 190-30 ¶ 4-2 (2005)).  This regulation states that military police investigators "will normally be employed in the following investigations," and includes "[o]ffenses for which the maximum punishment . . . is confinement for 1 year or less" on the list.  Army Reg. 190-30 ¶ 4-2.  Mr. Sullivan points out that he was suspected of a false official statement, an offense that carries a maximum confinement of five years.  Compl. ¶ 30.5.  Again, however, this regulation contains inherent discretion and only "normally" requires this level of expertise for serious offenses.  Army Reg. 190-30 ¶ 4-2.  Moreover, the investigation into Mr. Sullivan's false official statement offense did not begin as a serious offense investigation—it started as an assault investigation of which Mr. Sullivan was a victim.  For these reasons, Mr. Sullivan's allegation regarding Army Regulation 190-30 does not state a claim.

**Claim 8.**  Next, Mr. Sullivan asserts multiple errors related to the military police report provided to the Board.  *See* Compl. ¶¶ 23–24.  For example, he claims that military police investigators violated Army Regulation 190-45 when they created a military police report recounting his alleged attack in the Huachuca Canyon but failed to include "copies of 'all statements, photographs, sketches, laboratory reports, and other information that substantiates the offense or facilitates the understanding of the report.'"  Compl. ¶ 30.8 (quoting Army Reg. 190-45 ¶ 4-2(c)(1)); *see* Army Reg. 195-5 ¶ 5–1(e) ("Any supporting documentation relevant to the investigation, such as a detailed synopsis; statements from victim(s), subject(s),

and witness(es); preliminary police reports; crime scene images, sketches, and videos should be forwarded to the USACIL.") (2013).

Mr. Sullivan states that the missing laboratory documents from the military police report used before the BOI render it a "fake police report." *See* Compl. ¶ 24 ("It was a fake police report."); *id.* ¶ 28 ("All laboratory reports and correspondence from the forensic laboratory were omitted from the fake police report."); *id.* ¶ 28.1 ("Missing from the fake police report was an *Investigator Activity Summary* from LT Penland."). Mr. Sullivan alleges that multiple iterations of the police report existed, not all of which were included in the exhibits submitted to the Board. *See, e.g.*, Hr'g Tr. at 24:15–26:22. A liberal reading of these claims suggests that Mr. Sullivan states a procedural violation.

**Claim 9.** Mr. Sullivan also lists a litany of regulations and procedures—Army Regulation 600-8-24 ¶ 4-9(d)(7), Army Regulation 15-6, DoDI 1332.30, and 10 U.S.C. § 1185—and alleges that "[n]one of these requirements were met." Compl. ¶ 27. Though the Complaint fails to provide factual allegations that support this claim, a liberal construction of his Complaint demonstrates that these violations all relate to deficiencies in the military police investigation and military police report presented before the Board.

For example, the following paragraphs of his Complaint detail, without reference to specific regulations or statutes, that "laboratory reports and correspondence from the forensic laboratory were omitted from the fake police report"; the conclusion regarding latent prints was misrepresented; evidence was improperly packaged; hair found on Plaintiff's clothing following his attack was not tested; and an investigative activity summary was missing from the police report. Compl. ¶¶ 28, 28.1. Some of these allegations, such as the military police's apparent failure to test hair, fail to state a claim because they lack a violation of a regulation or are not procedural. *See Lindsay*, 295 F.3d at 1257 (citations omitted) (quoting *Gilligan*, 413 U.S. at 10) ("'[D]ecisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments'. . . beyond the institutional competence of courts to review.").

However, other allegations in this sequence present valid procedural defects. For example, Army Regulation 600-8-24 paragraph 4-9(d)(7) requires that the Board recorder "[e]nsure all records and documents relating to the case are provided to the board members." Army Reg. 600-8-24 ¶ 4-9(7). The definitional scope of "all records and documents relating to the case" is unclear and may not be expansive enough to require inclusion of the larger police report. *See id.* On its face, the regulation also appears to speak more to the procedural task of collecting documents and "[e]nsur[ing] all records and documents relating to the case are provided to the board members," as opposed to defining the outward bounds of all relevant records and documents. *See id.* Nevertheless, Mr. Sullivan presents a claim that a procedural violation occurred when relevant documents were omitted, such as the discrepancies in the police file with the missing laboratory reports. *See* Hr'g Tr. at 16:16–20:11, 86:15–88:5.

Similarly, Army Regulation 15-6 requires that the recorder, "at a reasonable time in advance of the first session of the board . . . provide [the] respondent a copy of all unclassified

documents in the case file and a letter of notification." [9]  *See* Compl. ¶ 27 (citing Army Reg. 15-6 ¶ 7-5 (2016)).  Mr. Sullivan alleges that he was not given the Board file for about six weeks after the first Board session and that the case file was missing the larger police report.  *See* Compl. ¶ 27; Hr'g Tr. at 20:10–11.  This also closely aligns with Mr. Sullivan's allegation that the Board failed to follow DoDI 1332.30's requirement that a respondent have "full access to, and be furnished copies of, records relevant to the case."  DoDI 1332.30, enclosure 5, ¶ 4(e); Compl. ¶ 27.  Again, the definitions in the Regulation are not clear on what is considered "the case file" or "records relevant to the case," but Mr. Sullivan's claim can be construed as alleging a procedural defect.

      **Claim 10.**  Mr. Sullivan further alleges that the Board failed to "consider all relevant and material evidence about the case" as required by DoDI 1332.30.  Compl. ¶ 27; *see* DoDI 1332.30, enclosure 3, ¶ 3(c).  The Board also allegedly failed to give Mr. Sullivan "an opportunity to respond to, and rebut, the basis for the contemplated separation."  Compl. ¶ 27; *see* DoDI 1332.30, enclosure 5, ¶ 4(e).  These allegations do not appear to state a claim.  Mr. Sullivan only alleges that "[n]one of these requirements were met."  Compl. ¶ 27.  He does not demonstrate specific evidence that the Board was required to review but did not, nor does he allege that he was denied an opportunity to respond.  Accordingly, this allegation fails to state a claim.[10]

      **Claim 11.**  Mr. Sullivan alleges that the Board failed to follow Army Regulation 600-8-24, which requires it to make a separate finding of each factual allegation and reason for involuntary separation.  Compl. ¶ 34; *see* Army Reg. 600-8-24 ¶ 4-15(b)(2) (2011).  While on its face this allegation suggests a procedural defect, the Complaint fails to plausibly state how this regulation was violated.  Rather, the Complaint contends that the Board based its determination that Mr. Sullivan made a false official statement on an "assessment of [his] motives and documented integrity issues" despite also finding that there was a lack of "convincing evidence to confirm or deny the [alleged hiking] attack."  Compl. ¶ 34.1.  According to the Complaint, this apparent contradiction undermines the Board's findings.  *Id.*  Additionally, the Complaint avers that the Board based its "documented integrity issues" on testimony from an officer who accused Mr. Sullivan of stealing money—an accusation Mr. Sullivan strongly disputes.  *Id.* at ¶ 34.4.  But the conclusion that this contravened Army Regulation 600-8-24 is unconvincing because the Board did make a separate finding of each reason for discharge.  *See* AR 54.  Mr. Sullivan's alleged violations here are misplaced attempts to have this Court re-weigh evidence.  *See Taylor*, 199 Ct. Cl. at 174 ("This court will not reweigh the evidence presented at plaintiff's court-martial in order that it might substitute its judgment for that of the military trial court.").  Here, Mr. Sullivan fails to state a claim.

      **Claim 12.**  Next, Mr. Sullivan alleges that the Army's chain of command failed to follow up on Mr. Sullivan's complaints about misconduct by officials, including that an officer lied

---

[9]  Mr. Sullivan actually cites Army Reg. 15-6, paragraph 5-5, but his language comes from paragraph 7-5.  There is no 5-5 in this edition.  *See* Compl. ¶ 27.

[10]  For the same reasons, Mr. Sullivan's allegation that he was not given access to relevant records under 10 U.S.C. § 1185 fails to state a claim.  *See* Compl. ¶ 27.

under oath during the Board proceeding.  *See* Compl. ¶¶ 36, 37, 39, 40.  However, claims regarding professional military decisions are not justiciable.  *See Lindsay*, 295 Fed. 3d at 1257 (citing *Gilligan*, 413 U.S. at 10).

**Claim 13.**  Mr. Sullivan alleges that his chain of command improperly influenced the outcome of the Board decision and military police investigation in violation of 10 U.S.C. § 837, a statute aimed at preventing commanding officers and other authorities from influencing the conduct of proceedings.  *See* 10 U.S.C. § 837.  While an unlawful command influence claim is justiciable, Mr. Sullivan failed to properly demonstrate the elements of the claim because a plaintiff establishing unlawful command influence "must show (1) a command relationship, (2) improper influence by virtue of that relationship, and (3) a nexus between the alleged influence and plaintiff's dismissal."  *Milas v. United States*, 42 Fed. Cl. 704, 712 (1999) (citing *Werking v. United States*, 4 Cl. Ct. 101, 105 (1983)).  Plaintiff does not allege any of these elements and, therefore, fails to state an unlawful command influence claim.

In sum, Mr. Sullivan properly alleges five procedural defects.  Mr. Sullivan's remaining factual allegations do not cite a corresponding statute or regulation and otherwise fail to state a justiciable claim.[11]  Accordingly, the Government's Motion to Dismiss is **GRANTED-IN-PART** and **DENIED-IN-PART** in accordance with the above.

## B.    Motion for Judgment on the Administrative Record

In the alternative, the Government moves for judgment on the administrative record.  It contends that the Army's decision to terminate Mr. Sullivan was supported by substantial evidence and that Mr. Sullivan waived many of the allegations in the Complaint because he failed to present them during administrative proceedings below.  Def.'s Mots. at 16–18.  Mr. Sullivan also cross-moves for a judgment on the administrative record, asserting that the BOI's findings could not be supported by substantial evidence.  *See* Pl.'s Resp. and Mots. at 73–76, ECF No. 22.  Mr. Sullivan further denies that waiver occurred.  *See* Pl.'s Resp. and Mots. at 43–54.

---

[11]  For example, the Complaint alleges that Mr. Sullivan was barred from submitting paperwork with regard to AWCP requirements and that "Army regulations and the record demonstrate" this was improper.  Compl. ¶ 16.  Elsewhere, Mr. Sullivan alleges that he was denied "a fair and impartial hearing" because he did not receive an audit of his exam results until after his rebuttal to the BOI was submitted, even though he requested the audit before the rebuttal was due. Compl. ¶ 21.7.  He critiques military investigators' apparent failure to test the hairs found on his shirt after his attack, which he claims rendered the separation proceedings unfair.  *See* Compl. ¶ 28.  Mr. Sullivan also states that the GOSCA failed to endorse a memorandum related to his service in violation of "regulations."  Compl. ¶ 38.  However, he cites no Army regulations that were violated by any of this, or other, conduct.  *See, e.g.*, Compl. ¶ 41 (ABRE's alleged failure to "review all case materials").  This Court can liberally construe filings by *pro se* litigants but cannot create claims on their behalf.  *See El*, 144 Fed. Cl. at 748.

1. **Standard of Review**

Cross-motions for judgment on the administrative record are governed by RCFC 52.1. This Court considers "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on evidence in the record." *Palantir USG, Inc. v. United States*, 904 F.3d 980, 989 (Fed. Cir. 2018) (citations omitted). Judicial review of military cases is conducted under the arbitrary and capricious standard. *Sharpe v. United States*, 935 F.3d 1352, 1358–59 (Fed. Cir. 2019). This Court must set aside the Army decision if a plaintiff demonstrates that the action was "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law." *Id.* (citing 5 U.S.C. § 706(2)(A)). A presumption of regularity entitles military officials to substantial deference in their decision-making. *Dodson v. United States*, 988 F.2d 1199, 1204 (Fed. Cir. 1993) ("[M]ilitary administrators are presumed to act lawfully and in good faith like other public officers, and the military is entitled to substantial deference in the governance of its affairs.") (citing *Arens v. United States*, 969 F.2d 1034, 1037 (Fed. Cir. 1992)). Overall, this Court must consider whether the agency's conclusion was supported by "substantial evidence," which is evidence that "a reasonable mind might accept as adequate to support a conclusion." *Strand v. United States*, 951 F.3d 1347, 1351 (Fed. Cir. 2020) (quotation marks omitted) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)); *see Heisig v. United States*, 719 F.2d 1153, 1156–57 (Fed. Cir. 1983).

2. **Waiver Analysis**

The Government first argues that many of Mr. Sullivan's claims of procedural defects were waived because he failed to raise them during administrative proceedings below and did not apply for a correction of his records at the Army Board for Correction of Military Records. Def.'s Mots. at 16–19. Under the waiver doctrine, "issues and arguments not made before the relevant military correction board or administrative agency are deemed waived and [cannot] be raised in a judicial tribunal." *Christian v. United States*, 46 Fed. Cl. 793, 802 (2000); *Parks v. United States*, 127 Fed. Cl. 677, 680 (2016) (citing *Metz v. United States*, 466 F.3d 991, 998 (Fed. Cir. 2006)) ("[A]ny argument not previously raised before the corrections board is waived."); *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952) ("Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice.").

Mr. Sullivan cannot be penalized for his failure to appeal to the Army Board for Correction of Military Records because this is not required. Military correction boards are a "permissive administrative remedy" and "not a mandatory prerequisite to filing a Tucker Act suit challenging the discharge." *Klingenschmitt v. United States*, 119 Fed. Cl. 163, 182 (2014) (quotation marks omitted) (quoting *Martinez v. United States*, 333 F.3d 1295, 1304 (Fed. Cir. 2003)); *Heisig*, 719 F.2d at 1155 (citing *Cunningham v. United States*, 549 F.2d 753, 765 (1977), *cert denied*, 445 U.S. 969 (1980) ("[A]lthough relief has usually been first sought from

military correction boards since their creation in 1946, there is here no requirement of exhaustion of administrative remedies prior to pursuit of judicial review.").[12]

Nevertheless, while Mr. Sullivan was not required to appeal to a military correction board, the doctrine of waiver applies equally to situations in which a plaintiff failed to raise arguments during a military proceeding, skipped over an appeal to a military correction board, and then filed in this Court. *See Exnicios v. United States*, 140 Fed. Cl. 339, 367 (2018) ("Plaintiff also waived his unlawful command influence claims by not raising [them] before the Field of Inquiry, in plaintiff's letter of appeal to the GOSCA, or in plaintiff's appellate brief to the Board of Review."); *Spehr v. United States*, 51 Fed. Cl. 69, 87–88 (2001) (holding plaintiff waived claim by not raising it during or after administrative discharge hearings) *aff'd* 49 F. App'x 303 (Fed. Cir. 2002).

Mr. Sullivan has five remaining claims of procedural defects: (1) the Army's failure to provide a copy of the underlying materials of the GOMOR under Army Regulation 600-37, paragraph 3-6; (2) failures by Army investigators to properly pack and seal evidence and use "superglue fuming" on latent print evidence under Army Regulation 195-5, paragraphs 5-1 and 5-2; (3) the Army's failure to include complete laboratory reports and supporting documentation in the military police report under Army Regulation 195-5, subparagraph 5-1(e); (4) the Board recorder's related failure to ensure that these laboratory reports were provided to the Board members under Army Regulation 600-8-24, paragraph 4-9; and (5) the Army's failure to provide Mr. Sullivan a copy of the case file under Army Regulation 15-6 and DoDI 1332.30.

**Army Regulation 600-37 Claim.** The Government argues that Mr. Sullivan waived his allegation that the Army violated Army Regulation 600-37 by failing to give him a copy of materials that justified his reprimand, such as the full police report. *See* Def.'s Mots. at 17–18; Def.'s Reply at 7–8. After receiving the GOMOR, Mr. Sullivan's rebuttal statement did not include any allegation regarding the Army's failure to provide him a copy of the underlying reprimand materials during the BOI proceedings, ABRE appeal, or in his congressional inquiry. Def.'s Reply at 7; *see* AR 11–14, 30–56, 87–88, 704–09. Furthermore, Mr. Sullivan's rebuttal included a statement declaring that he had "read and underst[ood] the unfavorable information presented against [him]." AR 759; *see* Def.'s Mots. at 17. Mr. Sullivan characterizes this statement as an understanding that he received the GOMOR only—not the underlying materials. *See* Pl.'s Resp. and Mots. at 52–53; *see* AR 86. Even if true, Mr. Sullivan had other opportunities during the BOI and ABRE appeal process to object to this violation, yet he never did. *See* AR 11–14, 30–54, 87–88, 704–09. Accordingly, this argument has been waived.

**Army Regulation 195-5 Claim.** The Government argues that Mr. Sullivan waived his allegation that military investigators violated Army Regulation 195-5 by failing to properly pack, seal, and use "superglue fuming" on evidence. *See* Def.'s Reply at 5. The Government notes that while Mr. Sullivan and his counsel before the agency relied on the fact that military police did not request additional testing on potentially exculpatory evidence, Mr. Sullivan failed to present his concerns with the packaging and evidence handling. *See id.* at 5–6. Mr. Sullivan's

---

[12] The Government appeared to abandon this position at oral argument. *See* Hr'g Tr. at 39:25–40:9.

briefing did not address waiver of this issue, nor does this allegation appear in the BOI transcript, ABRE appeal, or congressional inquiry.  *See* AR 11–14, 30–56, 87–88, 704–09.  This argument has been waived.

**Army Regulation 190-45 Claim.**  Next, the Government argues that Mr. Sullivan waived his allegation that the Army failed to include a complete military police report with supporting documentation under Army Regulation 190-45.  *See* Def.'s Reply at 6–7.  The Government points to the Board hearing transcript, which references that "Government Exhibit 21 – Forbis'[s] case file" was entered as an exhibit with no indication that Mr. Sullivan objected.  *Id.* at 21–22 (citing AR 32).  Mr. Sullivan's argument is different—he argues that items were missing from this report and the overall military police report was incomplete, not whether this report should be added. [13]  *See* Pl.'s Reply at 6.  Nevertheless, Mr. Sullivan did not contest the report at the time or include this allegation in his later appeal or congressional inquiry.  *See* AR 11–14.  This claim has been waived.

**Army Regulation 600-8-24, Army Regulation 15-6, and DoDI 1332.30 Claims.**  The Government does not provide specific arguments for waiver regarding Mr. Sullivan's two remaining claims but instead provides a blanket statement that waiver applies to nearly all of his claims.  *See* Def.'s Mots. at 17, 19; Def.'s Reply at 8.  Mr. Sullivan strongly rebuts any argument that his remaining claims were waived.  *See* Pl.'s Resp. and Mots. at 50.

Regarding his claim that the Board recorder omitted relevant documents and failed to present them to Board members, violating Army Regulation 600-8-24, Mr. Sullivan notes that the Board brought up the missing police report *sua sponte*.  Pl.'s Resp. and Mots. at 50 (citing AR 55).  More so, Mr. Sullivan claims that he could not have waived his objections because "deception and misrepresentation were involved," which prevented him from becoming aware of the errors in the first place.  *Id.*  This argument is unavailing.  Mr. Sullivan *did* argue in his congressional inquiry that "the full police report was not provided to CPT Sullivan prior to the board of inquiry," AR 13, but failed to argue that these records were not provided to the Board members under Army Regulation 600-8-24.  *Id.*  Nor did he claim that the full report should have been included in the record.  He was seemingly aware that a report may have been missing but failed to cite a violation of this regulation in his appeal.  His claim is therefore waived.

Mr. Sullivan has one remaining claim that has not been waived: his allegation that the Army failed to provide a copy of all unclassified documents in the case file under Army Regulation 15-6 and DoDI 1332.30, including what Mr. Sullivan believes to be a more-complete police report.  Mr. Sullivan did not receive the larger report, nor did he receive the Board file following the hearing until six weeks after the Board session.  The Government provides no basis

---

[13]  Mr. Sullivan's assertion, clarified at oral argument, is that the police report included in BOI Exhibit 21 contained more information than the police report submitted to the BOI as Exhibit 9.  *See* Hr'g Tr. at 16:16–22.

for waiver while Mr. Sullivan's congressional inquiry included this allegation. *See* AR 13 ("[T]he full police report was not provided to CPT Sullivan prior to the board of inquiry.").[14]

However, assuming that Mr. Sullivan is correct that a full case file containing the larger police report was not provided until six weeks after the Board convened, this error did not violate the alleged regulation. Army Regulation 15-6, paragraph 7-5, requires that the Board recorder provide the case file and notice to the respondent prior to the proceeding, including "a letter of notification," *see* Army Reg. 15-6 ¶ 7-5, whereas Mr. Sullivan's allegations relate to evidence presented during Board hearings. He argues that because he did not have the full military police case report in the case file and could not, therefore, present it to the Board, the Board was limited to evidence in the allegedly "fake police report." *See* Compl. ¶¶ 23–25, 27; Pl.'s Reply at 6; Pl.'s Resp. and Mots. at 80; *see generally* Compl. ¶¶ 27–28. But Mr. Sullivan himself admits that discrepancies between the report presented to the Board (the "fake police report") and other reports only "show sloppiness and . . . that there's . . . a bunch of different reports kind of floating around." Hr'g Tr. at 26:18–20. Mr. Sullivan has not demonstrated that any significant information exists in one report but not the other. *Id.* at 26:9–15.

Moreover, any error that did occur is still harmless because it did not affect the Board's findings regarding Mr. Sullivan's conduct. The information in the police report only peripherally relates to the allegation that he unlawfully cut himself, and this allegation was only one of the findings relied on for separation from the Army. *See* AR 55. Stated differently, the BOI made four determinations about Mr. Sullivan's conduct—that he unlawfully cut himself, falsely filed a police report, made false statements, and acted in a manner unbecoming an officer—and decided he should be separated based on these four reasons. *See* AR 54–55. Mr. Sullivan's claim of a procedural defect for failing to receive the case file might impact the Board's findings related to the case file, such as whether he unlawfully cut himself and falsely filed a police report, but curing this procedural defect does not change the Board's other finding that Mr. Sullivan made false statements. AR 55. And while the Board seemingly wavered on their findings related to the Huachuca Canyon incident, clarifying that it could not "confirm or deny" whether the attack occurred, the Board "overwhelmingly believe[d] that CPT Sullivan did intend to deceive 1SG Garcia" based on a "desire to meet the Army Weight Control Standards." *Id.*

Thus, Mr. Sullivan's termination was grounded on multiple factors unrelated to the claimed procedural defect. Because the Army's failure to provide the case file on time did not substantially affect the basis for the separation determination, Plaintiff's claim of procedural defect is harmless error. *See Christian v. United States*, 337 F.3d 1338, 1343 (Fed. Cir. 2003) (quoting *Hary v. United States*, 618 F.2d 704, 707 (Fed. Cir. 1980)) (stating that "it is not enough for the plaintiff to show merely that an error or injustice was committed in the administrative process," but that "he must go further and either make a showing that the defect substantially affected the decision to separate him" or "must set forth enough material to impel the court to

---

[14]  On the other hand, Mr. Sullivan's related allegation that this violates Army Regulation 600-8-24—requiring that the GOSCA forward the full case file to the Board—was waived because Mr. Sullivan only argued below that he, not the Board, never received it. *See* AR 13.

direct a further inquiry into the nexus between the error or injustice and the adverse action")
(quotation marks omitted).

### 3.      Substantial Evidence Analysis

Both parties have moved for judgment on the administrative record as to whether the
Army's termination of Mr. Sullivan was supported by "substantial evidence," i.e., evidence that
"a reasonable mind might accept as adequate to support a conclusion." *Strand*, 951 F.3d at 1351;
*see Heisig*, 719 F.2d at 1156–1157; *see* Def.'s Mots. at 19; Pl.'s Resp. and Mots. at 88.  As the
Government argues, Mr. Sullivan's termination—and the BOI's findings concerning his false
statements, false police report, self-injury, and unbecoming conduct—was supported by a myriad
of background evidence related to Mr. Sullivan's medical examinations and conduct following
his reported attack.  *See* Def.'s Reply at 8–12.

In opposition, Mr. Sullivan contends that many procedural defects, including the
incomplete record before the BOI and failures to comply with Army regulations—nearly all of
which have been dismissed or waived—demonstrate that the Army's separation decision was
arbitrary and capricious.  *See* Pl.'s Resp. and Mots. at 88–98.  But even assuming that these
claims have not been waived, substantial evidence exists to support the Army's separation
determination.

The BOI made four findings:
1. "CPT Charles T. Sullivan DID at or near Fort Huachuca, Arizona on or about 24
   July 2011, unlawfully cut himself."  AR 54.
2. "CPT Charles [T.] Sullivan DID at or near Fort Huachuca, Arizona, on or about
   24 July 2011, falsely report to the Military Police that he was attacked by an
   unknown male."  AR 54.
3. "CPT Charles T. Sullivan DID at or near Fort Huachuca, Arizona, on or about 28
   July 2011, with intent to deceive, make to 1SG Garcia, an official statement, to
   wit: 'he was 40 years old', which statement was totally false, and was then known
   by him to be so false."  AR 54.
4. "CPT Charles T. Sullivan DID conduct himself between on or about 24 July 2011
   and on or about 28 July 2011 in a manner unbecoming an officer and which
   constituted misconduct, or moral or professional dereliction because of his actions
   with and toward the U.S. Army."  AR 54.

Based on these findings, the Board recommended Mr. Sullivan's separation from the
Army with a general (under honorable conditions) characterization of service.  AR 55.  This
recommendation served as the basis for the ABRE's separation determination, DASA-RB's
findings, and Mr. Sullivan's eventual discharge.  The Board was presented with, and ostensibly
considered, a wide range of evidence that questioned Mr. Sullivan's integrity and paints a picture
of possible motivations behind the Board findings.  Though a reasonable factfinder could reach a
different conclusion in determining what truly occurred, this Court will "uphold a decision of
less than ideal clarity if the agency's path may be reasonably discerned."  *Williams v. United
States*, 116 Fed. Cl. 149, 158 (2014) (quoting *Bowman Transp., Inc v. Ark.-Best Freight Sys.,
Inc.*, 419 U.S. 281, 286 (1974)).  Ultimately, the Army's decision to eliminate Mr. Sullivan had a
reasonably discernable path for each BOI finding and the decisive separation determination.

As Mr. Sullivan recognizes, many of his problems began when he was "flagged" for potential noncompliance with the AWCP.  *See* Hr'g Tr. at 51:19–25.  The Board was aware that Mr. Sullivan had previously been flagged as overweight and in noncompliance with the AWCP and had passed a height and weight exam "by the bare minimum" before being deployed to Iraq in 2009. AR 51.  The Administrative Record demonstrates marked changes to his recorded height during his Army career, ranging from 67.75 inches in 2005 to 71 inches in March 2011. *See* AR 686.  Mr. Sullivan attributes this range to a documented medical condition, Scheuermann's disease, which "causes curvature of the thoracic spine with attendant diminution and potential fluctuations in height." AR 707; *see* Pl.'s Resp. and Mots. at 4 (citing AR 686). This might explain why Mr. Sullivan's height was two inches taller—from 69 inches to 71 inches—over a period of approximately forty days from January 31, 2011, to March 12, 2011. *See* AR 138, 144.  But the Board and ABRE appeal had this information, *see* AR 707, as well as a medical record finding conditions consistent with the disease in August 2011.  AR 549.

Along with fluctuations in height, the Board also considered changes to Mr. Sullivan's weight in the same period.  On January 31, 2011, Mr. Sullivan weighed 200 pounds, which exceeded the permitted maximum of 184 pounds for someone 69 inches tall under the AWCP. AR 138, 216.  But by March 12 of the same year, his height was 71 inches and his weight was at the exact upper threshold of 194 pounds for a soldier of that height.  AR 144, 216.  Moreover, the medical recorder for the March exam testified that they did not conduct a height and weight screening and could not specify who did.  AR 49.  Mr. Sullivan was identified with the same height and a weight of 193 pounds at the July 15, 2011 test where that medical recorder noted that Mr. Sullivan had already emailed the scorecard with the height and weight components pre-filled.  AR 39, 143.  Finally, two weeks later, during the July 25 and July 27 tests, Mr. Sullivan weighed 214 and 215 pounds and measured 69.5 and 68 inches tall, respectively.  AR 148, 170, 172.

The Board also heard multiple statements surrounding questionable activity by Mr. Sullivan during those examinations.  One examiner from the July 27, 2011 examination reported that she repeatedly had to tell Mr. Sullivan "to stop raising his heels off the ground and place his feet flat on the floor," and stop "turtl[ing]" and flexing his neck in an to attempt to make it larger. AR 37–39, 174.  The initial exam scheduled for July 25 was postponed because his abdomen was covered by a large bandage on his wound—even though the nurse who treated him the prior day had provided an exact bandage, a "4 x 4.75 piece of 3M Tegaderm Film which would in no way inhibit CPT Sullivan from being tapped [sic] during a Height and Weight test." AR 170.  It was Mr. Sullivan who wrapped his bandages in a way that precluded him from being measured.  *Id.*

Next, the Board considered Mr. Sullivan's alleged false statements.  Along with the above-mentioned incongruities in the medical test—turtling the neck and raising the heels—Mr. Sullivan stated "he was 40 years old."  AR 38, 55, 174.  This concerned Army officials because, while his birthday was in three days, each extra year in age allotted a two percent allowance in permitted body fat percentage, or approximately six more pounds.  *See* AR 216–17.  On the day of the July 27 test, Mr. Sullivan failed to bring his military identification card and had to give his age and other information to the attending examiner orally.  AR 37, 143.  The examiner testified before the Board that Mr. Sullivan stated his age "without even thinking about it" and did not

look confused.  AR 37–38.  Mr. Sullivan, on the other hand, explains that he was under the influence of Vicodin at the time, that the examiner misunderstood him, and that he "can't remember exactly what transpired" during the test but he did not lie about his age. Compl. ¶ 34.11.  He explained that "[o]n vicodin, I could have said anything" and that he was "not 'all there' due to the medication."  AR 53, 87; *see also* AR 706.  While Mr. Sullivan's explanation is possible, his July 15, 2011 physical fitness test *also* lists his age as 40 years old. AR 143.  As described above, this test was completed when Mr. Sullivan emailed the recorder with the scorecard pre-filled. AR 39, 167.

Outside of the medical examinations, the Board also considered the likelihood of the attack that occurred while hiking in Huachuca Canyon.  Here, the Board recognized that "the original investigation lacked significant substantiating evidence."  AR 55.  According to Mr. Sullivan, the alleged assailant was a possible "undocumented immigrant," "drug mule," and "unkempt Latino" wielding a box cutter.  AR 705.  A later search of the attack area revealed no subject, and no movement was detected on game cameras.  AR 200–01.  Sensors and border cameras from the area also failed to identify any suspects matching Mr. Sullivan's description of the assailant—though they also failed to identify Mr. Sullivan.  AR 149.

While investigators hypothesized that the assailant's box cutter's safety blade should have broken under the force used to cut through Mr. Sullivan's multiple shirts, investigators only found a plastic locking device for the box cutter and no broken blade.  AR 176.  Military investigators retrieved the box cutter because Mr. Sullivan "picked it up," though he handled the weapon without gripping it in a manner to protect discovery of latent prints.  AR 53, 159, 170, 362.  Investigators speculated that Mr. Sullivan would have presented as a difficult opponent because of his size, but he lacked defensive wounds.  AR 149–50.  Moreover, he suffered non-serious injuries to areas that a right-handed person could cause to oneself, and which also would prevent measurement during a test.  AR 170.  In the end, investigators concluded that the wounds could have been self-inflicted given their "depth, direction, and location."  AR 149–50.

Lastly, the Board was aware of the impact of Mr. Sullivan's noncompliance with the AWCP.  *See, e.g.*, AR 44.  Mr. Sullivan attests that the idea that "he may have gone to extremes to ensure he did not return to the Army over weight program [sic]" is a "gross misrepresentation because Mr. Sullivan would have suffered no adverse consequences" and was already in compliance before he was due to depart to Fort Benning. Pl.'s Resp. and Mots. at 9 (quoting Def.'s Mots. at 5); *see* Hr'g Tr. at 103:2–6.  He also notes that his tests were erroneous and could be fixed, so it would not prevent his transfer.  Hr'g Tr. at 103:2–6.  Again, however, the Board was aware of this argument, plus additional evidence that paints a different picture of potential consequences for noncompliance with the weight standards.

First, upon coming into noncompliance in July 2011, Mr. Sullivan was notified on August 1, 2011, that he was "permitted 90 days to meet the standards" and that if he did not, he would "be subject to separation from the service."  AR 541.  Moreover, the record shows that Mr. Sullivan's assignment to Fort Benning could be halted and he would be prevented from attending professional military schools.  *See* AR 217.  Finally, his permanent change-of-station orders to Fort Benning specify that soldiers are "responsible for reporting to [their] next duty

station/school in satisfactory physical condition, able to pass the Army Physical Fitness Test (AFPT) and meet weight standards."  AR 836.

Ultimately, it is not this Court's role to conduct a *de novo* review of the evidence.  *See de Cicco v. United States*, 230 Ct. Cl. 224, 228–29 (1982); *Joslyn v. United States*, 110 Fed. Cl. 372, 387 (2013).  While it is perhaps possible that a reasonable factfinder might accept Mr. Sullivan's explanations for the various inconsistencies and incongruities in his story, this Court's role is to ask whether the Board's findings—and thus the Army's separation determination—was based on substantial evidence.  For the myriad reasons discussed above, there is indeed substantial evidence.

Because the ABRE and DASA-RB made their separation determination based on this support, the Government's Motion for Judgment on the Administrative Record is **GRANTED** and Plaintiff's Cross-Motion for Judgment on the Administrative Record is **DENIED**.

### C.    Motion to Supplement the Administrative Record

Finally, Mr. Sullivan moves to supplement the administrative record with documents purporting to demonstrate points made in his Motion for Judgment on the Administrative Record.  *See* Pl.'s Resp. and Mots. at 78.  The Government contends that meaningful review can be conducted under the existing record.  Def.'s Reply at 24.

#### 1.    Standard of Review

The ability to submit additional information into the administrative record is limited. *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009).  The "focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."  *Camp v. Pitts*, 411 U.S. 138, 142 (1973).  The purpose of limiting review to the record is to prevent courts from using new evidence to "convert the 'arbitrary and capricious' standard into effectively *de novo* review."  *Murakami v. United States*, 46 Fed. Cl. 731, 735 (2000), *aff'd*, 398 F.3d 1342 (Fed. Cir. 2005).

This Court has in the past recognized limited exceptions where the administrative record may be supplemented, such as where the agency failed to consider relevant factors or where evidence exists of bad faith or improper behavior by agency officials.  *See id.* at 735 (citing *Cubic Applications, Inc. v. United States*, 37 Fed. Cl. 339, 342 (1997)); *see also Axiom*, 564 F.3d at 1379 (citing *IMS, P.C. v. Alvarez*, 129 F.3d 618, 624 (D.C. Cir. 1997)).  But the Court of Appeals for the Federal Circuit has warned that these exceptions "depart[] from fundamental principles of administrative law as articulated by the Supreme Court" and are "not the law of this circuit."  *Axiom*, 564 F.3d at 1381 (citing *Esch v. Yuetter*, 876 F.2d 976 (D.C. Cir. 1989)). Instead, "[t]he focus of judicial review of agency action remains the administrative record, which should be supplemented only if the existing record is insufficient to permit meaningful review consistent with the APA."  *Id.*; *see also Murakami*, 46 Fed. Cl. at 735 ("[E]xceptions to the general rule against extra-record evidence are based upon necessity, rather than convenience, and should be triggered only where the omission of extra-record evidence precludes effective judicial review.").

This Court, therefore, is limited to supplementing the record in instances in which it can "explain why the evidence omitted from the record frustrated judicial review as to the ultimate question of whether [the agency action] was arbitrary and capricious." *AgustaWestland N. Am., Inc. v. United States*, 880 F.3d 1326, 1332 (Fed. Cir. 2018) (citing *Axiom.*, 564 F.3d at 1379–80).

### 2.    Analysis

Plaintiff submitted ten appendices of documents for the Court's consideration. *See* Pl.'s Resp. and Mots., Apps. A–J. He also alleges that the agency relied on an erroneous record and that the supplementary evidence demonstrates bad faith and misconduct. *See, e.g.*, Pl.'s Resp. and Mots. at 80; Pl.'s Reply at 17. However, even if limited exceptions to supplement the record were recognized, none of the proposed supplementary material meaningfully alters the landscape of the Army decision to the extent that their omission would frustrate effective judicial review. *AgustaWestland*, 880 F.3d at 1332.

Plaintiff's appendices A, B, D, E, F, G, H, and J all contain new evidence that would require this Court to impermissibly re-weigh the substantive decision on the merits by, for example, questioning the reliability of witness testimony before the BOI or undermining the Board's ultimate determinations and findings outside of our standard of review. *See, e.g.*, Pl.'s Resp. and Mots. at 85 ("This item should be used to help complete the administrative record because it is directly tied to the veracity of military police testimony, under oath, at a BOI."); *id.* at 86 ("This item should be used to help complete the administrative record as it provides more information on how the discharge proceedings moved along, as well as the Army's further non-compliance with procedure, and failure in executing tasks listed in its own correspondence."). With Appendix H, the Plaintiff also asks this Court to engage in the nonjusticiable review of decision-making by military officials. *See* Pl.'s Resp. and Mots. at 87 ("It demonstrates that the congressional inquiry was forwarded to Fort Huachuca. Fort Huachuca took no action on this inquiry."). Lastly, appendices C, D, H, I, and J contain documents that are not probative of alleged procedural violations during Mr. Sullivan's separation proceedings and are not needed to conduct effective judicial review. *See, e.g.*, Pl.'s Resp. and Mots. at 14, App. C (regulations pertinent to GOMOR); *id.* at 84, App. D (regulations related to military police reports); *id.* at 87, App. H (copy of Mr. Sullivan's congressional inquiry); *id.* at 88, App. J (obituary of Captain John Mark); *id.* at 80, App. I (legal analysis by Mr. Sullivan on supplementing the record).

Because none of this evidence is required for "effective judicial review" of the Army determination, *Murakami*, 46 Fed. Cl. at 735, Plaintiff's Motion to Supplement the Record is **DENIED.**

## III.    Conclusion

For the reasons set forth above, the Government's Motion to Dismiss is **GRANTED-IN-PART** and **DENIED-IN-PART**, and the Government's Motion for Judgment on the Administrative Record is **GRANTED** as to the remaining claims. Plaintiff's Cross-Motion for

Judgment on the Administrative Record and Motion to Supplement the Administrative Record are **DENIED**.  The Clerk is hereby directed to enter judgment consistent with this opinion.

**IT IS SO ORDERED.**

 s/ Carolyn N. Lerner
CAROLYN N. LERNER
Judge